## No. 27682

**In Re Interrogatories by the Colorado State Senate (Senate Resolution No. 13) concerning House Bill No. 1247 Fifty-First General Assembly**

(566 P.2d 350)

Decided June 13, 1977.

James A. Roberts, Esq., Director of Legal Operations, Colorado Housing Finance Authority.

Willkie Farr & Gallagher, of counsel.

*En Banc.*

MR. JUSTICE KELLEY delivered the opinion of the Court.

This is an original proceeding in which the Senate of the Fifty-First General Assembly (1977) by Senate Resolution No. 13 seeks our opinion upon interrogatories submitted to us under article VI, section 3, of the Constitution of Colorado. The interrogatories question the constitutionality of House Bill No. 1247 entitled "*A Bill for an Act Making an Appropriation to the Colorado Housing Finance Authority.*" The bill has passed the House of Representatives and is pending in the Senate following passage on second reading. The Senate found that "the question of the constitutionality of . . . [the bill] is a matter of extreme importance and public interest; that an emergency exists and it is essential that

immediate judicial determination be secured; and that a solemn occasion within the meaning and intention of section 3 of article VI of the state constitution has arisen. . . .''

We have agreed to answer the interrogatories. We answer each interrogatory in the negative, finding no constitutional imperfections in House Bill 1247. We will consider the factual background and then answer the interrogatories.

On May 25, 1977, we issued an order granting to "any person who wishes or has a position in the matter [to] file their statement of position and any briefs by 5 o'clock on Tuesday, May 31, 1977, in the office of the Clerk of the Supreme Court." In response, the Colorado Housing Finance Authority filed a statement of position contending that each of the four interrogatories be answered in the negative, supporting its position by a well documented brief. No other appearances were made.

In 1973 the Colorado Housing Finance Authority Act (the "Act") was enacted, section 29-4-701, *et seq.*, C.R.S. 1973, and was amended in 1975 and further amended in 1976. Section 29-4-700.1, C.R.S. 1973 (1976 Supp.).

In the Act the legislature specifically found and declared that:

"(1) . . . there is a shortage in Colorado of decent, safe, and sanitary housing which is within the financial capabilities of low and moderate-income families. In order to alleviate the high cost of construction loans and home mortgage interest costs for such families, the general assembly believes that it is essential that additional public moneys be made available, through the issuance of revenue bonds, to assist both private enterprise and governmental entities in meeting critical housing needs. The general assembly also finds and declares that the compelling need within the state for such assistance can best be met by the establishment of a quasi-governmental and corporate entity vested with the powers and duties specified in this part 7.

"(2) . . . many housing facilities occupied by low and moderate-income families use excessive and unnecessary amounts of energy for heating and other home uses due to inadequate insulation or to the absence of other design features or materials which reduce total home energy requirements; that many such facilities cannot be repaired or improved within the financial capabilities of the low or moderate-income owners or occupants; and that existing private and public means of enterprise and investment cannot provide financing or assistance on terms and conditions within the means of many such low or moderate-income families. These conditions are adverse to the safety, health, and welfare of the citizens of this state and are contrary to the public policies of promoting the conservation of scarce energy resources. The general assembly therefore further finds and declares that it is a valid public purpose to preserve and promote the safety, health, and welfare of the citizens of this state by the exercise of the powers

specified in this part 7."
Section 29-4-701, C.R.S. 1973 (1976 Supp.).

In order to meet the public purposes set forth in the Act, the Colorado Housing Finance Authority (the "Authority") was established. Section 29-4-703(1), C.R.S. 1973 (1976 Supp.). It is provided that the Authority shall be a "body corporate and a political subdivision of the state," but it is specifically declared "not to be an agency of the state." Section 29-4-703(1), C.R.S. 1973 (1976 Supp.). The Authority is to have all of the "duties, privileges, immunities, rights, liabilities, and disabilities of a body corporate and political subdivision of the state." Section 29-4-707(1)(a), C.R.S. 1973. Among the powers specifically granted to the Authority are the powers to sue and be sued, to make and execute contracts, to purchase, lease, trade, exchange, or otherwise acquire, maintain and depose of real and personal property, and to borrow money and issue its negotiable bonds. Section 29-4-707(1), C.R.S. 1973.

The Authority is authorized to issue its revenue bonds and notes to provide funds for achieving its purposes. Section 29-4-714(1)(a)-(d), C.R.S. 1973 (1976 Supp.). In order to further secure its bonds, the Authority may establish "capital reserve funds" into which are deposited: "(a) Any moneys appropriated and made available by the state for purposes of such capital reserve funds;" Section 29-4-714.2(1)(a), C.R.S. 1973 (1976 Supp.). The moneys in the capital reserve fund may be used solely for the payment of principal and interest, sinking fund payments, the purchase or redemption of the bonds, or the payment of any redemption premium required to be paid in the event the bonds are redeemed prior to maturity. Section 29-4-714.2(2). However, no withdrawals from a capital reserve fund may be made which would reduce the capital reserve fund below the capital reserve requirement, as defined in section 29-4-714.2(4), unless other moneys of the Authority are not available to make the required payments. Section 29-4-714.2(2).

As to the contributions of the state to the capital reserve fund, the Act specifically provides that such contributions are discretionary. The Act compels the Authority to inform the governor yearly of the sum, if any, required to restore the capital reserve fund to the capital reserve requirement. The Act then provides that:

"The governor *may* transmit to the general assembly a request for the amount, if any, required to restore each capital reserve fund to the capital reserve fund requirement. *The general assembly may but shall not be required* to make any such appropriations so requested." (Emphasis added.)

Section 29-4-714.2(7). Further, the Act specifically states that "[n]othing provided in this section shall create or constitute a debt or liability of the state." Section 29-4-714.2(7). Finally the Act includes the following provision:

"The state of Colorado shall not be liable for bonds of the authority, and such bonds shall not constitute a debt of the state. The bonds shall contain on the face thereof a statement to such effect."
Section 29-4-720, C.R.S. 1973.

In order to achieve its authorized purpose of increasing the supply of decent, safe and sanitary housing for low and moderate-income families, the Authority may:

(a) make direct loans to sponsors of housing facilities for occupancy by low and middle-income families, Section 29-4-710(1)(a)(I), C.R.S. 1973 (1976 Supp.); and

(b) purchase mortgages from lending institutions and make loans to lenders on condition that such lending institutions and lenders make new mortgage loans to low and moderate-income families, in an amount at least equal to the amount purchased or loaned by the Authority. Section 29-4-710.5(1)(a) and (3), C.R.S. 1973 (1976 Supp.).

The Authority, in its brief, advises that since its establishment in 1973 the Authority has implemented a number of programs and issued bonds to finance those programs. With respect to the loans to lenders program, the Authority currently has outstanding $49,120,000 in its Loans to Lenders Home Loan Bonds and Loans to Lenders Homes Loan Refunding Bonds. In addition, $28,825,000 in loans to lenders bonds have been sold and are scheduled for delivery on June 15, 1977. With respect to the Direct Loan program, the Authority currently has outstanding $24,050,000 in its Multi-Family Housing Insured Mortgage Revenue Bonds.

No capital reserve fund has been established with respect to any of these bonds. The loans to lenders bonds previously issued are secured by a pledge of notes from each lending institution receiving a loan. Each note constitutes a general obligation of the lending institution and is fully collateralized. Similarly, the direct loan bonds are secured by a pledge of mortgages which are fully insured by the United States of America.

It further appears that the Authority is empowered to issue bonds to finance programs which do not have the security of the credit of a lending institution or the United States of America. Among such programs would be direct loans to sponsors which loans are not insured by the federal government and the purchase of mortgages not insured by the federal government. In order to make the bonds of the Authority to be issued to finance such projects saleable in the national bond market, the additional security of a reserve fund is needed. House Bill No. 1247 funds such a reserve fund.

The preamble to Senate Resolution 13 states that,
"WHEREAS, The Authority has been advised by its bond counsel that it will be unable to issue bonds secured by a capital reserve fund established pursuant to section 29-4-714.2(1), Colorado Revised Statutes 1973, and funded by the appropriation provided for by House Bill No. 1247 until

and unless certain questions as to the constitutionality of said appropriation are resolved by a decision of the Supreme Court of the State of Colorado; and

"WHEREAS, If the authority is unable to issue such bonds, the effectiveness of its programs for the financing of housing for low and moderate-income families will be seriously impaired, in that:

"(1) The authority would find it difficult if not impossible to make loans to provide the construction and permanent mortgage financing for multi-family rental housing developments for low and moderate-income families unless such loans are insured by the Federal Housing Administration, which insurance is, for practical purposes, unavailable in many areas within the State of Colorado;

"(2) The authority would be unable to qualify for the use of special rules and procedures promulgated by the U.S. Department of Housing and Urban Development to facilitate the utilization by state housing finance agencies of federal subsidies for housing for low-income families under Section 8 Housing Assistance Payments Program authorized by the U.S. Housing and Community Development Act of 1974;

"(3) As a consequence of the authority's inability to make non-FHA insured loans and its consequent inability to qualify for the aforementioned special rules and procedures, the availability of subsidies to enable low-income Colorado families to afford decent, safe, and sanitary housing may be restricted, especially in rural areas of the state where authority financing may be the only financing available for low-income housing development;

"(4) Because the authority must pay its administrative and operating costs from fees and charges assessed in connection with its lending program, any impairment of its ability to implement such programs restricts its capacity to raise operating revenues and thereby constitutes a threat to its continued existence;". . . .

It is the consensus of the Senate that the public and legislative purpose envisaged by the passage of the Colorado Finance Authority Act and House Bill No. 1247 will be substantially impaired unless the Authority is able to issue its revenue bonds.

### I.

Will obligations issued by the Colorado Housing Finance Authority and secured by a capital reserve fund established in accordance with the Colorado Housing Finance Authority Act, in which are deposited moneys appropriated by House Bill No. 1247, constitute a debt of the state within the meaning of sections 3 and 4 of article XI of the state constitution?

■ The obligations issued by the Authority secured by a capital reserve fund pursuant to section 29-4-714.2 into which House Bill No. 1247's appropriation of $150,000 will be deposited, do not constitute a

debt of the state within sections 3 and 4 of article XI;[1] they will be obligations of the Authority alone.

▮ The Authority is a corporation and a political subdivision of the state; it is not an agency of state government. Section 29-4-703(1). As such, the state has endowed it with the power to incur obligations in its own name and to be solely responsible for them. Section 29-4-707(1).

▮ This court has long held that separate and distinct bodies corporate are solely responsible for their own obligations. *See generally, Lyman v. Town of Bow Mar*, 188 Colo. 216, 533 P.2d 1129 (1975); *Fladung v. City of Boulder*, 165 Colo. 244, 438 P.2d 688 (1968); *Lewis v. State Board of Agriculture*, 138 Colo. 540, 335 P.2d 546 (1957); *People ex rel. Rogers v. Letford*, 102 Colo. 284, 79 P.2d 274 (1938). In addition, the act specifically states that the Authority's bonds do not constitute a debt of the state and that the state shall not be liable for them. Sections 29-4-720 and 29-4-714.2(7).

▮ The purpose of article XI, section 3, of the Colorado Constitution is "to prevent the pledging of [state] revenues of *future* years." *In re Senate Resolution No. 2*, 94 Colo. 101, 114, 31 P.2d 325, 330 (1933) (emphasis added); *see also Johnson v. McDonald*, 97 Colo. 324, 49 P.2d 1017 (1935). House Bill No. 1247 does not create a "debt" within the meaning of section 3 because it does not create an obligation "that requires revenue from a tax otherwise available for general purposes to meet it." *Johnson v. McDonald, supra.*

▮ Additionally, the appropriation is purely discretionary and nonobligatory; consequently, it does not constitute a debt. Section 29-4-714.2(7). To constitute a debt in the constitutional sense, one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature. In *City of Trinidad v. Haxby*, 136 Colo. 168, 315 P.2d 204 (1957), we held that an *enforceable* obligation against the general revenues of the city constituted the creation of a constitutional debt. *See also, Reimer v. Town of Holyoke*, 93 Colo. 571, 27 P.2d 1032 (1933).[2]

We note that other jurisdictions when faced with this issue have consistently held that discretionary appropriations provisions do not create

---

[1]Article XI, section 3 of the Colorado Constitution provides in pertinent part:
"The state shall not contract any debt by loan in any form, except to provide for casual deficiencies of revenue, erect public buildings for the use of the state, suppress insurrection, defend the state, or, in time of war, assist in defending the United States;. . . ."
Article XI, section 4, provides in pertinent part:
"In no case shall any debt above mentioned in this article be created except by a law which shall be irrepealable, until the indebtedness therein provided for shall have been fully paid or discharged; . . . ."
[2]Even though the issuance of revenue bonds for the creation of improvements may obligate future municipal councils to pay them, such bonds do not constitute a debt within the purview of article XI, sections 3 and 4. *See generally, Perl-Mack Civil Ass'n v. Baker District*, 140 Colo. 371, 344 P.2d 685 (1959), and cases cited therein; *see also* section 31-35-408, C.R.S. 1973.

constitutional debts. *California Housing Finance Agency v. Elliott*, 17 Cal.3d 575, 551 P.2d 1193 (1976), 131 Cal. Rptr. 361; *Massachusetts Housing Finance Agency v. New England Merchants Nat'l Bank of Boston*, 356 Mass. 245, 249 N.E.2d 599 (1969); *Wein v. City of New York*, 36 N.Y.2d 610, 331 N.E.2d 514, 370 N.Y.S.2d 550 (1975); *Martin v. No. Carolina Housing Finance Authority*, 277 N.C. 29, 175 S.E.2d 665 (1970); *Johnson v. Pennsylvania Housing Finance Authority*, 453 Pa. 329, 309 A.2d 528 (1973); *State ex rel. West Virginia Housing Development Fund v. Waterhouse*, 212 S.E.2d 724 (W.Va. 1974).

■ House Bill No. 1247 is a one-time payment of $150,000 to the Authority. The appropriation itself does not set up a sinking fund, nor is it being made from funds otherwise appropriated. House Bill No. 1247 does not fall within the definition of "debt" nor the policy of section 3. *See* cases cited, *supra.*

## II.

Does the appropriation provided for by House Bill No. 1247 constitute the lending or pledging of the state's credit within the meaning of and in violation of section 1 of article XI of the state constitution?

■ The appropriation does not constitute a pledge of the state's credit in violation of section 1, article XI, of the Colorado Constitution.[3] First, since no debt is created, there is no lending of credit. When no debt or obligation of the state is created, the state cannot be said to have lent its credit in violation of article XI, section 1. *Ginsberg v. City and County of Denver*, 164 Colo. 572, 436 P.2d 685 (1968). For a general discussion of this issue, *see* Am. Jur. 2d *States* §80.

■ Second, the appropriation does not fall within the policy of section 1, which is, according to *McNichols v. City and County of Denver*, 101 Colo. 316, 74 P.2d 99 (1937), to prohibit mingling of public funds with private funds. *See also, Milheim v. Moffat Tunnel Improvement Dist.*, 72 Colo. 268, 211 P. 649 (1922) (concurring opinion); *Lord v. City and County of Denver*, 58 Colo. 1, 143 P. 284 (1914). The Authority is not a "private" corporation but, as noted, is a body corporate and a political subdivision of the state. Section 29-4-703(1).

■ Third, the prohibition is inapplicable because the appropriation furthers a valid public purpose. *McNichols v. City and County of Denver*, 131 Colo. 246, 280 P.2d 1096 (1955); *see also, California v. Elliott, supra; Minnesota Housing Finance Agency v. Hatfield*, 297 Minn. 155, 210 N.W.2d 298 (Minn. 1973); *West v. Tennessee Housing*

---

[3] "Neither the state, nor any county, city, town, township or school district shall lend or pledge the credit or faith thereof, directly or indirectly, in any manner to, or in aid of, any person, company or corporation, public or private, for any amount, or for any purpose whatever; or become responsible for any debt, contract or liability of any person, company or corporation, public or private, in or out of the state."

*Development Agency*, 512 S.W.2d 275 (Tenn. 1974); *State ex rel. Housing Development Fund v. Waterhouse, supra.* The legislative declaration of 1976 emphasizes that it was compelled to establish the authority to meet critical needs in the areas of low and middle-income housing and to conserve scarce energy resources being consumed in inadequately designed and constructed housing. Section 29-4-701.

### III.

Does the appropriation provided for by House Bill No. 1247 constitute the making of a donation or grant to or in aid of a corporation by the state within the meaning of and in violation of section 2 of article XI of the state constitution?

 The appropriation does not violate section 2, article XI.[4] First, the Act states that the Authority is a political subdivision of the state, as well as a corporation. Section 29-4-703(1). Section 2 does not prohibit a grant from the state to a subdivision of itself, the provision only prohibits grants to *private* corporations. *McNichols v. Police Protective Ass'n of Denver*, 121 Colo. 45, 55, 215 P.2d 303, 308-09 (1950); *Lord v. City and County of Denver, supra*, 58 Colo. at 15-16, 143 P. at 288-289. Second, the prohibition is inapplicable because the public purpose doctrine noted above applies. *See McNichols v. City and County of Denver, supra.*

### IV.

Does House Bill No. 1247 provide for an appropriation for a charitable, industrial, educational, or benevolent purpose to a person or corporation not under the absolute control of the state within the meaning of and in violation of section 34 of article V of the state constitution?

 The appropriation does not violate section 34 of article V.[5] The Authority is a creature of the state, given its powers by the state, and thus a governing body controlled by the state. Section 34 prohibits appropriation to private institutions. A review of the proceedings of the Colorado Constitutional Convention reveals that the phrase "not under the absolute control of the state" was added specifically to insure that public entities would not be covered by the provision. We note in *In Re Relief Bills*, 21 Colo. 62, 39 P. 1089 (1895):

". . . This amendment was essential in order that the state might support the educational and other institutions established and fostered by the territorial government. There being no disposition to withhold state aid

---

[4] Article XI, section 2, of the Colorado Constitution provides in pertinent part:
". . .[T]he State . . . shall . . . [not] make any donation or grant to, or in aid of, or become a subscriber to, or shareholder in any corporation or company. . . ."

[5] Article V, section 34 of the Colorado Constitution, provides:
"No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association."

308

from these institutions, the amendment became necessary in order that such aid might be extended in the future."

*Id.* at 68, 39 P. at 1091; *see also, Bedford v. White,* 106 Colo. 439, 106 P.2d 469 (1940); *Williamson v. Board of County Commissioners,* 23 Colo. 87, 46 P. 117 (1896).

Since the appropriation in question is in furtherance of a valid public purpose, the provision is not violated. *Bedford v. White, supra.* In *Bedford* we noted that "it is universally held that if such payments are for a public purpose, the . . . fact that the [incidental] recipients are private persons does not violate this constitutional provision." 106 Colo. at 454, 106 P.2d at 476; *see also, Minnesota Housing Finance Authority v. Hatfield, supra; West v. Tennessee Housing Authority, supra.* Here the appropriation is designed to promote the public purpose of providing housing for low and moderate-income persons — a valid public purpose. Consequently, the provision is not violated.

Accordingly, we hold that house Bill No. 1247 is constitutional.

MR. JUSTICE CARRIGAN does not participate.