A.Y. Levine Deputy Director Department of Administration 1525 Sherman Street, 7th Floor Denver, Colorado 80203
Dear Mr. Levine:
I am writing in response to the request of your office for a formal legal opinion concerning possible statutory and constitutional restrictions on the use by state educational institutions of installment purchase contracts to acquire data processing equipment and other personal property.
QUESTIONS PRESENTED AND CONCLUSIONS
Your inquiry raises two specific questions:
1. Does C.R.S. 1973, 23-5-104, which appears to bar the governing boards of state educational institutions from creating mortgages upon institutional property, generally prohibit state educational institutions from acquiring personal property under installment purchase contracts which grant purchase money security interests in the acquired property to the sellers?
My conclusion is "no."
2. Does reservation by the seller of a purchase money security interest in personal property sold to the state under an installment purchase contract in and of itself give rise to constitutionally prohibited state debt?
My conclusion is that it does not.
ANALYSIS
It is my understanding that the Divisions of Purchasing and Automated Data Processing (ADP) have for several years acquired data processing equipment on behalf of state agencies and institutions under installment purchase contracts which grant the seller a purchase money security interest in the equipment. On other occasions, the state has acquired similar equipment by lease-purchase from commercial lessors. Because title to leased equipment technically remains in the lessor, local taxing authorities have recently begun to levy personal property taxes against equipment leased to the state. Inasmuch as these taxes must be paid by the lessor, prospective lessors are now refusing to submit bids on proposed lease-purchases or are inflating the lease rentals quoted in their bids to reimburse themselves for any taxes which may be levied against the equipment. Conversely, because title passes to the buyer in an installment purchase transaction, equipment sold to the state under installment purchase contracts is exempt from local personal property taxation. See C.R.S. 1973, 39-3-301(d) (1982 repl. vol. 16B). As a result, bids received for proposed installment purchases have not increased the scheduled installment payments to compensate the prospective seller for personal property tax liability. Under these circumstances, it is financially advantageous to the state to acquire data processing equipment and other personal property by installment purchase instead of lease-purchase.
However, unlike a lessor, whose retained title to the equipment and corresponding right of entry secures it against the lessee's nonrenewal of the lease or default, an installment seller who conveys title to the buyer must secure itself by reserving a purchase money security interest in the equipment. This has prompted the questions asked by your office.
Security interests are the direct descendants of "chattel mortgages" which, before the adoption of the Uniform Commercial Code in Colorado, secured installment sellers against default. Since the language of C.R.S. 1973, 23-5-104 appears to bar state institutions of higher education from creating "mortgages" upon institutional property, it is necessary to ascertain whether this statutory prohibition applies to "chattel mortgages" or purchase money security interests reserved in personal property conveyed to state educational institutions under installment purchase contracts.
The inquiry whether a security interest can be granted to a seller under C.R.S. 1973, 23-5-104, moreover, poses an even more fundamental question: whether reservation of a purchase money security interest by an installment seller in personal property purchased by the state creates constitutionally proscribed state debt under Colo. Const. art. XI, § 3. Unless installment purchase contracts which grant purchase money security interests to sellers are constitutionally permissible, it is self-evident that no state agency or institution may finance equipment acquisitions by these means. I have, therefore, considered whether installment purchase transactions similar to those utilized by the Divisions of Purchasing and ADP to acquire data processing equipment or other personal property pass constitutional muster under Colo. Const. art. XI, §3.[1]
C.R.S. 1973, 23-5-104 provides:
 The governing board of any state educational institution shall not create a mortgage upon any property belonging to the institution, nor shall the state be obligated for the purpose of securing the repayment of any funds advanced pursuant to the provisions of sections 23-5-102 to 23-5-105 or the interest on such funds.
On its face, the first clause of this statute appears flatly to forbid governing boards to create mortgages upon institutional property, while its second clause disclaims the state's obligation to secure repayment of funds advanced pursuant to C.R.S. 1973, 23-5-102 to 23-5-105 and the interest on such funds. C.R.S. 1973, 23-5-102, -103 and — 105, in turn, empower institutional governing boards to issue and sell tax exempt revenue bonds or comparable debt obligations to finance certain types of income producing auxiliary facilities on their campuses.[2] The question to be decided is whether the prohibition against creating mortgages upon institutional property set forth in the first clause of section 23-5-104 is, as it appears to be, unqualified, or whether it applies only to mortgages pledged as additional security for the revenue bonds or other obligations issued pursuant to sections 23-5-102, -103 and -105.
The statutes now codified as C.R.S. 1973, 23-5-102 to 23-5-105
were first enacted by the Thirty-ninth General Assembly in 1953 as H.B. 234: "An Act to Enable State Educational Institutions to Finance the Constructing and Equipping of Buildings and Facilities and the Acquisition of Land Therefor." 1953 Colo. Sess. Laws, ch. 210, secs. 1-7 (hereafter "H.B. 234" or "the Act"). Although sections 1 and 2 of the Act, now C.R.S. 1973,23-5-102 and 23-5-103 respectively, have since been amended in several respects, they then, as now, authorized institutional governing boards to issue and sell revenue bonds or debt obligations to finance the construction or acquisition of enumerated, income producing auxiliary facilities. C.R.S. 1973,23-5-104 has not been amended since 1953. Then, as section 3 of the Act, it read:
 The governing board of any state educational institution shall not create a mortgage upon any property belonging to the institution, nor shall the state be obligated, for the purpose of securing the repayment of any funds advanced pursuant to the provisions of this Act, or the interest on such funds.
(Emphasis added.) See C.R.S. 1953, 124-1-8; C.R.S. 1963, 124-1-6.
A close comparison of the texts of C.R.S. 1973, 23-5-104 and section 3 of H.B. 234 (as well as its 1953 and 1963 codifications) discloses that the revisor of statutes, when codifying the statute during the preparation of the 1973 Colorado Revised Statutes, omitted the comma which had originally followed the phrase "nor shall the state be obligated . . . ." When section 3 of H.B. 234 and the 1973 codification are read together, it is evident that the deletion of this comma introduced an ambiguity into an otherwise clear statement of legislative intent. Unlike C.R.S. 1973, 23-5-104, the original Act does not ambiguously imply that the phrase "for the purpose of securing any funds advanced . . . ." modifies only the antecedent clause "nor shall the state be obligated." Rather, the 1953 text makes it plain that both the clause prohibiting mortgages and the clause disclaiming a state obligation are limited by the phrase "for the purpose of securing the repayment of any funds advanced pursuant to the provisions of / the / Act, or the interest on such funds" — i.e., that the Thirty-ninth General Assembly intended the first clause of section 3 to do no more than proscribe the use of mortgages of institutional property as additional security for the repayment of debts incurred to finance the auxiliary facilities enumerated earlier in the Act.
It is a well-settled rule of statutory construction that "A statute is passed as a whole . . . and is animated by one general purpose or intent. Consequently each part or section should be construed in connection with every other part or section, so as to produce a harmonious whole. Thus it is not proper to confine interpretation to the one section to be construed." 2A C. Sands,Sutherland Statutory Construction, § 45.06 (3d ed. 1973). See People's Bank v. Banking Board,164 Colo. 564, 436 P.2d 681 (1968); Sands, supra, § 47.06. Interpreted in light of this principle and the maxim that "(w)hen punctuation . . . conveys a clear meaning, the courts should give weight to its as evidence," Sands, supra, section 47.15, it is plain that section 3 of the 1953 Act (as well as its 1953 and 1963 codifications) did not flatly proscribe mortgages of institutional property, but merely forbade creating mortgages upon such property to secure repayment of funds advanced to construct, acquire or equip certain auxiliary facilities and the interest on such funds.
It is my opinion that C.R.S. 1973, 23-5-104 must be given effect as a continuation of section 3 of H.B. 234 as adopted in 1953 and codified as C.R.S. 1953, 124-1-8 and C.R.S. 1963, 124-1-6. The substantive content of the statute remains unaltered by the revisor's deletion of the comma from the 1973 codification.See C.R.S. 1973, 2-5-113(3) (1980 repl. vol. 1B); 2-7-203 (1980 repl. vol. 1B); 2-5-103 (1980 repl. vol. 1B). Seealso C.R.S. 1973, 2-4-207, -208 (1980 repl. vol. 1B). So construed, C.R.S. 1973, 23-5-104 prohibits only those mortgages of institutional property created to secure the repayment of funds advanced pursuant to C.R.S. 1973, 23-5-102 to 23-5-105 and the interest on such funds. See also People v.North Avenue Furniture Appliance, Inc., 645 P.2d 1291
(Colo. 1982) (holding that the revisor's bifurcation of a single section into two subsections could not be given any substantive significance in interpreting one of the subsections and that, under C.R.S. 1973, 2-5-113(3), the entire section's substantive content remained identical to that of the original enactment and was to be given effect as its continuation).
Having ascertained this, it remains to be decided whether the use of an installment purchase contract to finance the acquisition of personal property entails an advancement of and agreement to repay funds within the meaning of sections 23-5-102 to 23-5-105. If it does not, a purchase money security interest in data processing and similar equipment financed by an installment purchase is not tantamount to a mortgage upon institutional property prohibited by section 23-5-104.
C.R.S. 1973, 23-5-102 authorizes institutional governing boards to borrow funds for
 constructing, otherwise acquiring, and equipping housing facilities, dining facilities, recreational facilities, health facilities, and parking facilities. . . and for the acquisition of land for such purposes.
(Emphasis added.) The rule of expressio unius exclusioalterius states that "where . . . the . . . things to which / a statute / refers are designated there is an inference that all omissions should be understood as exclusions." Sands,supra, § 47.23. So construed, section 23-5-102
authorizes governing boards to borrow funds, using the means set forth in section 23-5-103, for the construction, acquisition and equipping of those types of facilities enumerated in the statute: housing facilities, dining facilities, recreational facilities, health facilities, parking facilities and land to be used for such facilities. It neither authorizes nor forbids borrowing to finance other, omitted types of facilities or equipment. Therefore, C.R.S. 1973, 23-5-104's prohibition against mortgages of institutional property does not apply to mortgages — and, ipso facto, to security interests — created to secure payment by the institution of the installment price of personal property which is not purchased or used to equip a facility within one of the enumerated categories.[3]
I therefore conclude that C.R.S. 1973, 23-5-104 prohibits only those mortgages of institutional property intended to secure repayment of revenue bonds or other self-liquidating debts incurred by the state institutions of higher education to finance the construction, acquisition or equipping of housing, dining, recreational, health and parking facilities and the acquisition of land for those facilities. It does not otherwise bar granting installment sellers purchase money security interests in personal property sold to educational institutions.
The second question posed by your inquiry is whether a seller's reservation of a purchase money security interest in equipment acquired by the state under an installment purchase contract gives rise to state "debt" prohibited by Colo. Const. art. XI, § 3. To answer this question it is necessary, first, to examine the underlying installment purchase transaction in light of this constitutional prohibition and, second, to ascertain whether the constitutional characteristics of an installment purchase are affected by the seller's reservation of a security interest in the acquired equipment.
"`To constitute debt in the constitutional sense, one legislature, in effect, must obligate a future legislature to appropriate funds to discharge the debt created by the first legislature.'" Gude v. City of Lakewood, 636 P.2d 691,699 (Colo. 1981). See In re Interrogatories bythe Colorado State Senate, 193 Colo. 298, 566 P.2d 350
(1977); City of Trinidad v. Haxby, 136 Colo. 168,315 P.2d 204 (1957). "The purpose of article XI, § 3 of the Colorado Constitution is `to prevent the pledging of / state / revenues of future years.'" In reInterrogatories, supra, 566 P.2d at 355 (emphasis in original). See In re Senate Resolution No.2, 94 Colo. 101, 31 P.2d 325 (1933). As a corollary of the rule that art. XI, § 3 proscribes only those debts which entail a pledge of revenues of future years, the Colorado Supreme Court has twice recently held that multi-year governmental obligations comprising an initial term of one year or less ending on the last day of the current fiscal year and renewable at the option of the public obligor for a series of fiscal year to fiscal year renewal terms, do not create "debt" in the constitutional sense. See Gude v. City ofLakewood, supra; Glennon Heights, Inc. v.Central Bank Trust, 658 P.2d 872 (Colo. 1983). Thus, if "renewal of each lease term is specifically tied to appropriation of sufficient funds, and the lease terminates with no further obligation of the / state / if funds are not available," no unconstitutional debt has been incurred because "nothing in the agreement limits the discretion of / any future / legislature."Glennon Heights, Inc. v. Central Bank Trust,supra, 658 P.2d at 879.
Although the Gude and Glennon Heights cases dealt with long-term real property lease-purchases, the court's reasoning is equally applicable to multi-year personal property lease-purchase agreements and installment purchase contracts. If, as I understand to be true of the lease-purchases and installment purchases negotiated by the Divisions of Purchasing and ADP, the state lessee or buyer may elect to terminate the obligation without further pecuniary liability in the event that funds for the rental or installment payments due during the forthcoming fiscal year are not appropriated, budgeted or otherwise made available, the transaction does not give rise to unconstitutional debt. The state lessee's or buyer's option to terminate the obligation without further pecuniary liability preserves future legislatures' discretion to appropriate or not appropriate funds to make the rental or installment payments due in succeeding fiscal years. Therefore, since state revenues of future years have not been pledged to pay for the equipment, no debt proscribed by Colo. Const. art. XI, § 3 has been incurred. "Where rental obligations are contingent upon exercise of yearly renewal options, the agreement is not an unconstitutional debt." Glennon Heights, Inc. v. CentralBank Trust, supra, 658 P.2d at 879.See Gude v. City of Lakewood,supra; In re Interrogatories,supra.
The question remains, however, whether an annually renewable multi-year installment purchase contract — which, in and of itself, does not create constitutional debt — is transformed into a constitutionally prohibited debt obligation by the seller's reservation of a purchase money security interest in the equipment sold to the state. The Gude andGlennon Heights cases were concerned not with installment purchases, but with lease-purchases. Technically, these two types of transactions differ in one important respect. While title to lease-purchased property remains in the lessor (until the lessee exercises its purchase option or, in the case of a full pay-out lease, until all rental payments have been made), title to installment purchased property passes to the buyer on or about the date of its delivery and acceptance.See generally C.R.S. 1973, 4-2-401(2). An installment seller's reservation of a purchase money security interest in property sold to a state agency or institution thus creates a lien against state-owned property which, in the event of nonrenewal or default, may be enforced by repossession, public or private sale of the collateral and, under certain circumstances, a suit for a deficiency. See generally, C.R.S. 1973,4-9-503, -507. In short, by entering into a purchase money security agreement with an installment seller, the state obligates itself, so long as any portion of the purchase price remains unpaid, to relinquish its title to the purchased property should it choose to terminate or default on the contract.
Arguably this continuing obligation to surrender ownership of state property for which substantial sums may have been paid acts as a practical constraint on future legislatures' discretion to decline to appropriate the funds necessary to pay the remainder of the purchase price. See, Morris, Evading DebtLimitations with Public Building Authorities: The CostlySubversion of State Constitutions, 68 Yale L. J. 234, 258-260 (1958). So conceived, a security interest granted to a seller may be characterized as a pledge of past installment payments which, by making nonrenewal of the contract economically or politically impractical, ensures the state's future performance and thus operates as a pledge of future
state revenues or a "debt" within the meaning of Colo. Const. art. XI, § 3.
While this characterization of a security interest as a constitutionally prohibited debt is not entirely implausible, I believe it to be inconsistent with the reasoning underlying the Colorado Supreme Court's decisions in Gude v. City ofLakewood, supra and Glennon Heights, Inc. v.Central Bank Trust, supra. Although, because the transactions in both cases were lease-purchases, not installment purchases, the court did not expressly address the constitutional propriety of granting a seller a purchase money security interest in the acquired property, its repudiation inGude of the argument that the lessor's right of entry is tantamount to constitutional debt applies with equal force to the argument that a purchase money security interest creates debt in the constitutional sense. A comparison of the two types of transactions discloses no constitutionally relevant distinctions between the governmental interests at stake in the event of nonrenewal or default. A lease-purchase is practically, if not always technically, a secured transaction. Even though title never passes to the lessee and therefore need not be relinquished to the lessor upon nonrenewal or default, the lessor possesses a right of entry empowering it to retake possession of the leased property from a nonrenewing or defaulting lessee and to hold the lessee liable for a deficiency. Indeed, under the Uniform Commercial Code, title 4, C.R.S. 1973, leases of personal property "intended as security" are deemed to be security interests. So understood, many personal property lease purchases are legally indistinguishable from installment purchases.See C.R.S. 1973, 4-1-201(37); 4-2-401, 4-9-102(2).See also, Lease Finance, Inc. v. Burger,40 Colo. App. 107, 575 P.2d 857 (1977).
Moreover, the lease-purchases considered in Gude andGlennon Heights were so-called "full pay-out" leases. Title to the demised premises was to pass to the lessee without additional consideration upon completion of the lease term and payment in full of all rentals. Under such leases the sum of the rentals is equal to the sum necessary to amortize the cost of the leased property over the full term of the lease —i.e., to the purchase price of the property plus accrued interest. Many courts have recognized that such full pay-out "financing leases," whether of real or personal property, are not true leases but disguised installment sales reserving a security interest in the property in the lessor. See
Nichols, Debt Limitations and the Bona Fide Long-term Leasewith an Option to Purchase: Another Look at Lord Coke, 9 Urban Lawyer 403 (1977); Leary, The Proscrustean Bed ofFinance Leasing, 56 N.Y.U. L. Rev. 1061 (1981); and cases cited therein.
Under these circumstances the governmental lessee, although it has not acquired formal title to the leased premises, faces the same practical obstacles to termination of its annually renewable obligation as does a governmental installment purchaser. Like the installment purchaser, the full pay-out lessee has bargained for a conveyance of unencumbered title to the property without additional consideration upon payment in full of all rentals. Like the installment purchaser who risks repossession of the property and forfeiture of its title if it terminates its contract, the full pay-out lessee risks exercise of the lessor's right of entry, repossession of the property and forfeiture of its contractual right to a conveyance if it terminates its lease. In both instances, therefore, an interest in title and past payments (each of which equals a fraction of the property's purchase price plus interest) are held hostage to the government's continued performance of the contract or lease — creating a strong incentive (although not a legal obligation) to future legislatures to continue to appropriate the funds necessary to pay the installment payments or rentals due in succeeding years.
Indeed, when the state enters into a lease purchase of real property as in Glennon Heights, Inc. v. Central Bank Trust, supra, the incentive to appropriate the sums necessary to renew the lease is stronger than it is when the state lease-purchases or installment purchases personal property. Unlike the financing lessee or installment buyer of personal property who, under title 4, C.R.S. 1973, acquires an ownership equity which survives nonrenewal or default, see,e.g., C.R.S. 1973, 4-9-504(2), the real property lessee has no right to reimbursement for any part of the present value of its past rental payments.
Notwithstanding these considerations — which underpin the arguments intended to characterize a purchase money security interest as constitutional debt — the Gude court held
 We are aware of the argument that, although the city's lease is terminable in form, practicalities dictate that the likelihood of termination is remote . . . because of the prospect, gaining substance with each rental payment, that the city will become the owner of the building when the bonds have been retired. . . . We are unpersuaded that these practicalities should result in the characterization of terminable rental obligations as the equivalent of general obligation debt. . . . The ability to terminate its lease gives the city flexibility which is real, not illusory. We cannot say that the city will never avail itself of its termination right.
636 P.2d at 700. See Edgerly v. HoneywellInformation Systems, Inc., 377 A.2d 104 (Me. 1977) (contract for the installment purchase of data processing equipment reserving a security interest in the seller and giving the state the option to terminate without further liability in the event future legislatures should fail to make the necessary appropriations did not constitute state debt within the meaning of art. IX, § 14 of the Maine Constitution).
Because the annually renewable, full pay-out real property financing leases sustained as constitutional in Gude
and Glennon Heights are in all relevant respects identical to annually renewable installment purchase contracts of personal property and because the practical obstacles impeding exercise of the governmental lessors' options to terminate their obligations in those cases were even stronger than those facing a personal property installment purchaser, it is my opinion that an installment seller's reservation of a purchase money security interest in equipment acquired pursuant to an otherwise constitutional installment purchase contract does not in and of itself give rise to a state debt proscribed by Colo. Const. art. XI, § 3.
SUMMARY
It is my conclusion that neither C.R.S. 1973, 23-5-104 nor article XI, section 3 of the Colorado Constitution bar the governing boards of state educational institutions from acquiring personal property under installment purchase contracts which grant a purchase money security interest in the acquired property to the seller. C.R.S. 1973, 23-5-104 prohibits only those mortgages of institutional property intended to secure repayment of revenue bonds or other self-liquidating debts incurred to finance the construction, acquisition or equipping of housing, dining, recreational, health and parking facilities and the acquisition of land for those facilities. It does not otherwise preclude granting an installment seller a purchase money security interest in personal property acquired by the institution. Moreover, if an installment purchase contract does not give rise to debt in the constitutional sense, the seller's reservation of a purchase money security interest in the purchased property does not transform the obligation into a debt proscribed by Colo. Const. art. XI, § 3. The security interest is not legally or practically tantamount to a pledge of state revenues of future years which obligates future legislatures to appropriate funds for the purpose of making the installment payments due under the contract.
Very truly yours,
 DUANE WOODARD Attorney General
CONTRACTS EDUCATION, HIGHER EDUCATIONAL INSTITUTIONS STATE DEBTS
C.R.S. 1973, 23-5-102
C.R.S. 1973, 23-5-103
C.R.S. 1973, 23-5-104
C.R.S. 1973, 23-5-105
Colo. Const. art. XI, § 3
ADMINISTRATION, DEPARTMENT OF
State educational institutions are not barred by C.R.S. 1973,23-5-104 from executing installment purchase contracts for personal property which grant the seller a security interest in the property being purchased. A purchase money security interest in personal property given in connection with the installment purchase thereof does not in and of itself constitute prohibited state debt under Colo. Const. art. XI, § 3.
[1] I have not, however, examined, nor do I express an opinion on, the constitutionality of any specific or standardized installment purchase contract drafted or executed by the Divisions of Purchasing or ADP or any other state agency or institution.
[2] The sections to which the second clause refers generally authorize governing boards to "enter into contracts . . . for the advancement of money . . . and providing for the repayment of such advancements with interest . . . ." for the purpose of "constructing, otherwise acquiring and equipping . . . ." several enumerated types of auxiliary facilities; to "pledge the net income derived or to be derived from such land or facilities so constructed, acquired and equipped as security for the repayment of the moneys advanced therefor; together with interest thereon, . . . ."; and to issue and sell interim warrant or bonds to evidence the advancement of moneys for the purposes specified. C.R.S. 1973, 23-5-102, 23-5-103(1) and 23-5-103(2). Section23-5-105 exempts bonds, certificates, or warrants issued pursuant to sections 23-5-102 to 23-5-105 from state or local taxation.
[3] Interpreting C.R.S. 1973, 23-5-102, 23-5-103, 23-5-104 and23-5-105 as a whole, see People's Bank v. BankingBoard, supra, it is also evident that the legislature contemplated that the facilities constructed or acquired under section 23-5-102 would be financed by revenue bonds or similar obligations payable from the net income derived from the facilities and the net pledged or surplus income derived from other facilities "not acquired and not to be acquired with moneys appropriated to the institution by the State of Colorado." C.R.S. 1973, 23-5-103(1). See C.R.S. 1973, 23-5-103(2) — (4). If the 1953 Act is viewed as a comprehensive scheme authorizing revenue bond financing of income producing auxiliary facilities, section 23-5-104's prohibition against mortgages is most readily understood as a legislative endorsement of the constitutional doctrine enunciated by the Colorado Supreme Court in McNichols v. City of Denver, 123 Colo. 132, 230 P.2d 591
(1950). McNichols held that revenue bonds secured by a mortgage on either existing property or the property to be financed lose their character as "special fund" obligations and hence create unconstitutional "debt" within the meaning of Colo. Const. art. XI. But see Allardice v. AdamsCounty, 173 Colo. 133, 476 P.2d 982 (1970). However, since installment purchases of nonincome producing personal property are not financed from a "special fund," the McNichols
doctrine and the legislative intent animating section 23-5-104
have no bearing on the reservation of purchase money security interests in such equipment.